# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9049 | **DATE** | 8/29/2002 |
| **CASE TITLE** | Kiser vs. Naperville Community Unit, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/26/2002 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendants' motions to dismiss [6-1, 7-1] are granted in part and denied in part. A status hearing is set for September 26, 2002 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| ✓ | Notified counsel by telephone. | | AUG 3 0 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | 27 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |



MICHAEL L. KISER,
                Plaintiff,        )    Case No. 01 C 9049

     v.

NAPERVILLE COMMUNITY UNIT, et al.,
                Defendants.       )    Judge Joan B. Gottschall

## MEMORANDUM OPINION & ORDER

Plaintiff Michael L. Kiser pursues this action against his former employers, Naperville Community School District 203, DuPage and Will Counties, Illinois, and the Board of Education of Naperville Community School District 203 (collectively, the "District"), along with Donald E. Weber, in his official capacity as Superintendent of the District, and seven individually named Board members ("Board Members"), also in their official capacities. In his three-count complaint, Kiser alleges that defendants: (1) violated his rights under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; (2) breached his employment contract; and, in the alternative to Count 1, (3) deprived him of his First and Fourteenth Amendment rights. The District moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and to strike Kiser's request for punitive damages. Weber and the Board Members have filed a separate motion to dismiss all claims against them as individuals. For the reasons set forth below, the motions are granted in part and denied in part.

## I. Background

The allegations set forth in the complaint are accepted as true for present purposes. In 1980, Kiser began working for the District as the Assistant Superintendent for Personnel. He received tenure in 1983, and in 1991 began vesting in the State of Illinois Teachers' Retirement System ("TRS"). In 1993, he assumed the additional duties of District Counsel. Throughout his employment with the District, he received performance ratings higher than "satisfactory" and full salary increases. (Compl. ¶ 9.)

27

In July 1999, Kiser entered into a four-year employment contract with the District for the position of Executive Administrator. This contract included the following relevant provisions. First, it provided five grounds for terminating Kiser's employment contract: mutual agreement, death, permanent disability, cause, or irreconcilable differences. Second, it stipulated that should the Board terminate Kiser's contract for irreconcilable differences, it would reclassify Kiser to a different position and continue to pay him the contractual salary until the expiration of the contract, provided that Kiser release all claims, rights, or causes of actions that he might have against it. Kiser asserts that these provisions were part of his consideration for the contract, because pursuant to 105 ILCS 5/24-11, he had to relinquish his tenure rights upon entering this contract. Third, the contract added to Kiser's retirement benefits. Should Kiser give two-years notice of his intent to retire at the end of his contract to take a TRS annuity, he would receive salary increases of twenty percent of the prior year's salary in each of the last two years of employment, partial payment at retirement for unused sick days, and access to the District's group life insurance for ten years after retirement.

In March 2001, Kiser gave the District notice that he intended to retire on June 30, 2003 when the contract expired. He would then be 55 years old, the minimum age permitted to receive a retirement annuity of 74.6% of his final average salary under Illinois law. 40 ILCS 5/16-132. On April 25, 2001, Kiser met with two members of the Board to discuss his retirement letter. These two members informed Kiser that "it would be more cost effective to eliminate the position of in-house counsel." (Compl. ¶ 22.) They confirmed their intention to eliminate Kiser's position in a letter dated April 27, 2001. On June 12, 2001, the District offered to reclassify Kiser. The offer included a reduced salary and required Kiser to waive all claims against the District and the Board. Kiser attempted to accept the offer of reclassification, including the reduced salary, but conditioned acceptance on the reservation of any potential claims. The District rejected Kiser's counter-offer.

2

On June 25, 2001, the Board unanimously approved a resolution to eliminate the position of General Counsel, and Kiser was terminated on June 30, 2001. Kiser alleges that at no time did the District provide him with either a pre-termination or post-termination hearing, nor did it explain why it was terminating Kiser's employment position except to state that it was "cost effective." (*Id.* ¶ 62.) Kiser claims that the Board terminated him to prevent him from remaining employed until age 55 to avoid paying him "age-based retirement benefits." (*Id.* ¶ 32.) He further contends that the District replaced him with younger employees and contractors. Finally, he notes that "cost effectiveness" was not a ground for termination under the contract. (*Id.* ¶ 57.) Based on these allegations, Kiser brings two counts: violation of the ADEA (Count 1) and breach of contract (Count 2).

The bulk of Count 3 is premised on alternative causal stories. In 1997, with permission from the Board, Kiser began dating a member of the Board, Livia McCammon, whom he eventually married in early 1999. During 1998-1999, McCammon and three other former Board members attempted unsuccessfully to replace Weber as Superintendent. Kiser refused to publicly oppose these attempts. Kiser claims that defendants retaliated against him because he remained silent. In April of 1999, a Board Member told Kiser that his career would be "ruined" if he did not tell his wife to either end her opposition to Weber or resign. (*Id.* ¶ 66.) Kiser alleges that on January 3, 2000, Weber removed him from the Administrative Cabinet (the District Management Committee), informing Kiser that the reason for his removal was that it was "obvious that [he didn't] control [his] wife."[1] (*Id.* ¶ 69.) Kiser claims that defendants retaliated against him for associating with McCammon. Finally, Kiser alleges that defendants' reason for terminating him, cost effectiveness, was a pretext and that similarly situated employees were treated differently than he was.

---

[1]McCammon, along with the three other opposing members, had resigned from the School Board in August 1999.

Because of, "but not limited to," these acts (*id.* ¶ 70), Kiser brings Count 3 under under §

1983 alleging violations of his First and Fourteenth Amendment rights. Specifically, Kiser

claims that the District retaliated against him for exercising his freedom of speech and freedom

of association rights, deprived him of his substantive and procedural due process rights, and

violated his right to equal protection.

## II. Analysis

In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court assumes

the truth of the facts alleged in the complaint and draws all reasonable inferences in favor of the

plaintiff. *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001). "A court may dismiss a

complaint only if it is clear that no relief could be granted under any set of facts that could be

proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Under Fed. R. Civ. P. 10(c), "[a] copy of any written instrument which is an exhibit to a pleading

is a part thereof for all purposes." Thus, the court considers the exhibits attached to Kiser's

complaint for the purpose of these motions to dismiss. *See Wright v. Associated Ins. Cos., Inc.*,

29 F.3d 1244, 1248 (7th Cir. 1994). Failure to state a federal claim is the basis of defendants'

jurisdictional argument, so their invocation of Rule 12(b)(1) does not affect the standard of

review. *See Peckmann v. Thompson*, 966 F.2d 295, 297 (7th Cir. 1992) ("If a defendant's Rule

12(b)(1) motion is an indirect attack on the merits of the plaintiff's claim, the court may treat the

motion as if it were a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which

relief can be granted.").

## A. Individual Defendants

Weber and the seven individual Board Members argue that they must be dismissed from

the case. As noted above, Kiser sues each only in his or her official capacity. Because official

capacity suits are equivalent to suing the entity itself, *Monell v. Dep't of Soc. Servs.*, 436 U.S.

658, 690 n.55 (1978), the individual defendants argue that naming them in their official

capacities serves no legitimate purpose. The court agrees. *See Admiral Theatre v. City of*

4

*Chicago*, 832 F. Supp. 1195, 1200 (N.D. Ill. 1993) ("Where the unit of local government is sued as well, the suit against the officials is redundant and should therefore be dismissed."). The claims against the individual defendants are therefore dismissed.[2]

B. Punitive Damages

Kiser requests punitive damages. The District asserts that punitive damages are not recoverable against municipal corporations, citing chiefly *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). The holding of *Fact Concerts* is limited to § 1983 claims, *id.* at 271, but the discussion reveals that punitive damages against municipal corporations are also barred under Illinois law, *id.* at 260 (citing *Chicago v. Langlass*, 52 Ill. 256, 259 (1869)). None of the cases cited by the District involves the ADEA. In *Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684, 688 (7th Cir. 1982), the Seventh Circuit held that punitive damages and damages for pain and suffering—beyond the statutorily prescribed liquidated damages limit for "willful violations," 29 U.S.C. § 626(b)—are not available under the ADEA. Subsequent to *Pfeiffer*, the Supreme Court clarified that "Congress intended for liquidated damages [under the ADEA] to be punitive in nature." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125 (1985). Unlike other types of punitive damages, liquidated damages for willful violations of the ADEA are available against municipal corporations. *See, e.g., Kossman v. Calumet County*, 800 F.2d 697, 702 (7th Cir. 1986), *overruled on other grounds by Coston v. Plitt Theatres*, 860 F.2d 834, 836 (7th Cir. 1988); *Orzel v. Wauwatosa Fire Dep't*, 697 F.2d 743 (7th Cir. 1983).

The result is a mixed bag for the District. Because a school district is treated like a municipal corporation, *Sherman v. Community Consol. Sch. Dist.*, 714 F. Supp. 932, 938 n.5 (N.D. Ill. 1989), the District is immune from a punitive damages award on Kiser's federal constitutional and state law claims. Kiser may nonetheless be entitled to recover liquidated damages from the District under the ADEA. Reading the complaint in the light most favorable

---

[2]In his response brief, Kiser suggests for the first time that he may want later to amend his complaint to name the individual defendants in their individual capacities. The present dismissal of Kiser's official-capacity suits is without prejudice to such an amendment.

to Kiser and taking *Trans World Airlines* into account, this court interprets Kiser's request for punitive damages as seeking such liquidated damages. Accordingly, the District's motion to strike Kiser's request for punitive damages is granted in part and denied in part.

## C. Count 1: Age Discrimination

The District moves to dismiss Kiser's ADEA claim on two grounds. First, it contends that Kiser falls into a category of employees which is not covered by the ADEA. Alternatively, it argues that Kiser has not alleged age-based discrimination.

### 1. *Definition of Employee*

The ADEA protects only "employees," a category that is defined to exclude:

> any person elected to a public office in any State or political subdivision by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

29 U.S.C. § 630(f). The District asserts that Kiser's position as General Counsel made him both an appointee on the policymaking level and an immediate advisor. Thus, the District argues, the ADEA does not protect Kiser.

"The determination of status as a policymaker in many cases presents a difficult factual question." *Nekolney v. Painter*, 653 F.2d 1164, 1169 (7th Cir. 1981); *see also Soderbeck v. Burnett County*, 752 F.2d 285, 288-89 (7th Cir. 1985). This case is no exception. The position of "General Counsel" does not necessarily imply that Kiser engaged in policymaking activities. *Stinneford v. Speigel Inc.*, 845 F. Supp. 1243, 1245-46 (N.D. Ill. 1994) (finding that defendant's General Counsel was protected by the ADEA because he was not a high-level policymaking employee).[3] This court must confine itself to the facts pleaded, which suggest that, much like the

---

[3]The court recognizes that the General Counsel in *Stinneford* worked for a private corporation as opposed to a public entity for which Kiser worked. However, the reasoning of that case is nonetheless persuasive. *Stinneford* reasoned that because the General Counsel was "primarily an attorney doing legal work, and not a high policymaking employee," he did not fall into the "bona fide executive" exception from ADEA coverage. 845 F. Supp. at 1246. Similarly, if Kiser was primarily an attorney doing legal work and not policymaking, he should not fall into

General Counsel in *Stinneford*, Kiser may not have been a policymaking employee. Kiser directs the court's attention to the "Performance Goals" listed in the appendix of his employment contract. (Compl. Ex. C at 10-12.[4]) He maintains that these goals outline his job responsibilities, and he asserts that they do not include any unequivocal policymaking duties. The goals suggest that Kiser's three primary responsibilities were to assist in the employment and retention of qualified personnel, to provide legal services, and to "[p]articipate as a member of the management team (comprised of the Board and the administration) in the District's efforts to enhance student performance." (*Id.* at 10.) The last goal appears closest to "policymaking," but even here the result is uncertain. It is reasonable to suppose that not every member of "the administration" is engaged in policymaking. Someone on the team may well have been responsible solely for policy implementation. Whether Kiser was more like a player or a coach cannot be resolved on the face of the pleadings. This court cannot find as a matter of law that Kiser was an appointee at the policymaking level.

Nor can this court find that Kiser was an "immediate advisor" with respect to the constitutional or legal powers of a public office. The District argues that this exemption applies to Kiser because Kiser acted as the District's legal advisor. To support this argument, the District relies on several cases finding legal advisors exempt from the ADEA. However, the cases upon which it relies are inapposite.

Four of the District's cases are decisions issued at the summary judgment stage. *Gunaca v. Texas*, 65 F.3d 467, 479-73 (5th Cir. 1995); *Rutland v. Moore*, 54 F.3d 226, 231-32 (5th Cir. 1995); *Heck v. City of Freeport*, 985 F.2d 305, 310 (7th Cir. 1993); *Teneyuca v. Bexar County*, 767 F.2d 148, 151-52 (5th Cir. 1985). Significantly, three of the four decisions comment on the

---

the policymaking exemption. *See also Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 726-27 (2d Cir. 1984).

[4]There are actually two separate appendices, one for the position of "District Counsel and Assistant Superintendent for Human Resources" and one for "General Counsel." Kiser's "Executive Administrator" position apparently encompassed both. Confusingly, the first page of each appendix is labeled "10."

difficult factual nature of determining whether the employee is exempt and stress the importance of having summary judgment evidence. *See, e.g., Gunaca*, 65 F.3d at 473 (commenting that "determining whether [the plaintiff] is exempt from the protection of the ADEA . . . would not lend itself well to disposition by summary judgment were it not that most of the necessary facts are provided by statute or by plaintiff's testimony and summary judgment evidence"); *Rutland*, 54 F.3d at 231 (relying on "uncontroverted summary judgment evidence" to show that a special assistant attorney general was exempt from the ADEA). The remaining two cases upon which the District relies were decided on motions to dismiss. *EEOC v. Reno*, 758 F.2d 581, 584-85 (11th Cir. 1985); *Ramirez v. San Mateo County Dist. Attorney's Office*, 639 F.2d 509, 511-13 (9th Cir. 1981). However, the *Reno* court found that Florida statutes exempted the employee from the ADEA, and the *Ramirez* court applied a local charter to make the employee determination.

In the instant case, there is no statute, local charter, or uncontroverted summary judgment evidence indicating that Kiser was the type of legal advisor that should necessarily be exempt from the ADEA's coverage. Rather, the scant evidence available to the court is inconclusive. For example, in the "Critical Objectives" list in the "General Counsel" appendix to Kiser's employment contract, one of the objectives is to establish "a comprehensive legal services office, with an initial focus on: . . . creating a structure for distinguishing legal services which will be provided by or supervised by the General Counsel and those which will be provided directly to the Board by outside counsel." (Compl. Ex. C at 11.) This objective suggests that outside legal counsel, not Kiser, may have advised Board members on the constitutional or legal powers of the office. In addition, it appears that the immediate advisor exception "is meant to apply to those employees who are in 'a close personal relationship' with the official." *Goodwin v. Circuit Court*, 729 F.2d 541, 548 (8th Cir. 1984) (quoting legislative history).[5] Kiser maintains that he

---

[5] *Goodwin*, like several of the other cases cited above, interpreted Title VII, not the ADEA, but the relevant statutory language is identical. *Compare* 42 U.S.C. § 2000e(f) (Title VII) *with* 29 U.S.C. § 630(f) (ADEA).

did not have a close personal relationship with either the Board Members or the Superintendent. It is simply too early to tell whether Kiser qualified as an employee for purposes of the ADEA.

## 2. *Age-Based Discrimination*

The District also argues that Kiser has not adequately alleged age-based discrimination. The District claims that its decision to terminate Kiser was financially motivated and notes that it is not necessarily a violation of the ADEA to terminate an employee to reduce exposure to pension benefits. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611-12 (1993). The District's reliance on *Hazen Paper* is misplaced. *Hazen Paper* did not hold that employment actions motivated by a desire to reduce exposure to pension benefits never violate the ADEA. Rather, the Court limited its holding to terminations that reduced pension benefits that "would have vested by virtue of the employee's years of service." *Id.* at 613. The Court explicitly declined to address whether employment termination to reduce exposure to pension benefits based on the employee's age would violate the ADEA. *Id.*

The Seventh Circuit addressed the latter issue in *Huff v. UARCO Inc.*, 122 F.3d 374 (7th Cir. 1997). There, the court affirmed the denial of a defendant's motion for summary judgment on an ADEA claim where the pension plan was triggered by "a hybrid of age and years of service." *Id.* at 388. It reasoned that "[b]ecause age is an express condition of receiving a benefit . . . [n]othing in *Hazen Paper* prohibits a finding that [defendant's] expressly age-related policy violates the ADEA." *Id.* Where age is a component of the pension plan, termination to avoid the associated costs can violate the ADEA.

Kiser alleges that his contractual retirement benefits had an age component. The District disputes this allegation, arguing that all of these benefits were "as achievable for someone aged 35 as [for] someone aged 55." (Reply at 3.) Kiser has the better argument, at least with respect to the following: (1) salary increases of 20% during each of his final two years of employment; (2) payment for unused sick days; and (3) access to life insurance after retirement. (Compl. Ex. C, at 5.) Under the contract, each of these benefits was available only if Kiser "retire[d] at the

9

end of the term of his contract to take a TRS annuity." (*Id.* at 4.) A TRS annuity, in turn, is available only to "[a] member who has at least 20 years of creditable service . . . upon or after attainment of age 55." 40 ILCS 5/16-132. Kiser would have turned 55 just weeks before the date his contract with the District was set to expire. His contractual retirement benefits were partially age related, so his case is closer to *Huff* than to *Hazen Paper*. Accordingly, the court denies the District's motion to dismiss Kiser's ADEA claim.

## D. Count 2: Breach of Contract

Because this court has jurisdiction over Kiser's ADEA claim, it has supplemental jurisdiction over his breach of contract claim. 28 U.S.C. § 1367(a). The District argues that this court should nonetheless dismiss Kiser's contract claim, because "every [attorney-client] contract implies the client's right to discharge the lawyer, with or without cause and with no further obligation thereto." (Reply at 7.) In support of this proposition, the District quotes *Anastos v. Chicago Regional Trucking Ass'n, Inc.* 618 N.E.2d 1049, 1051 (Ill. App. Ct. 1993): "we believe that an attorney is subject to discharge at any time, with or without cause, and is without remedy against the client or employer for post-termination breach of contract damages." At first blush, this language does appear to support the District's position. Soundbites, however, often deceive, so this court looks to the facts and reasoning of *Anastos*, as well as other Illinois case law for indications as to how the Illinois Supreme Court would decide the question at issue. *See Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) ("[I]n determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").

Anastos's employer terminated him while he was employed as general counsel pursuant to a ten-year contract with at least nine years remaining. The Illinois Appellate Court held that Anastos could not recover any post-termination damages from his employer for breach of contract. Quoting the Illinois Supreme Court, the court explained:

> Generally, a client may discharge his attorney at any time, with or without cause. [Citation.] This rule applies equally to in-house

10

> counsel as it does to outside counsel. Further, this rule recognizes that the relationship between an attorney and client is based on trust and that the client must have confidence in his attorney in order to ensure that the relationship will function properly.

*Id.* at 1050 (quoting *Balla v. Gambro, Inc.*, 584 N.E.2d 104, 109 (Ill. 1991)) (internal quotation marks omitted). Allowing post-termination breach of contract damages, the appellate court concluded, "would have a chilling effect upon the ability of a client to exercise the right to discharge as the cost of exercising that right could be litigation with the former attorney." *Id.* at 1051.

The District's reliance on *Anastos* is misplaced. Most fundamentally, the District errs in attempting to extract an absolute, rather than merely general, rule from that case. *Compare* Mem. at 12-13 ("every"); Reply at 7 ("every . . . absolute"), *with Anastos*, 618 N.E.2d at 1050 ("Generally") (quoting *Balla*, 584 N.E.2d at 109). This error, compounded with inattention to the Illinois Supreme Court's authoritative statements in analogous cases, leads the District seriously astray. The holding in *Anastos* was driven by a perceived need to protect the trust and confidence required for an effective attorney-client relationship. It is this relationship, not an employee's law license or job title, that justifies limitations on an attorney-employee's right to recover post-termination damages from a client-employer.

The Illinois Supreme Court appreciates the point. In *Balla v. Gambro, Inc.*, 584 N.E.2d 104 (Ill. 1991), the court announced a general rule barring in-house counsel from suing their employers for retaliatory discharge because allowing such claims might make employers "less willing to be forthright and candid with their in-house counsel." *Id.* at 109. The plaintiff there had both legal and nonlegal employment responsibilities. In determining whether the general rule applied to the plaintiff's retaliatory discharge claim, the court stated that it had to consider plaintiff's argument that his discharge resulted from information he learned as a layperson in a nonlegal position. *Id.* at 111. After examining the summary judgment record, the court concluded that the plaintiff's claim was based on information he had learned while he was simultaneously fulfilling both legal and nonlegal duties, and therefore barred his claim. *Id.* at

112. This step in the analysis was necessary only if it could have affected the result. In other words, had the plaintiff's discharge claim not implicated the attorney-client relationship, it would have been permitted. *See Golightly-Howell v. Oil, Chem. & Atomic Workers Int'l Union*, 806 F. Supp. 921, 924 (D. Colo. 1992) (applying Colorado law) ("[W]here an in-house attorney whose employment is subject to a 'just-cause' contract is unlawfully discharged for reasons not implicating the attorney-client relationship, the attorney is not precluded from suing the company."); *see also Nordling v. N. State Power Co.*, 478 N.W.2d 498, 502 (Minn. 1991) ("[W]e see no reason to deny the job security aspects of the employer-employee relationship if this can be done without violence to the integrity of the attorney-client relationship.").

In light of the common purposes served, this court predicts that the Illinois Supreme Court would follow the same approach in determining the viability of an in-house attorney's breach of contract claim against a client-employer. *See Rhoades v. Norfolk & W. Ry. Co.*, 399 N.E.2d 969, 975 (Ill. 1979) (explaining that a client's right to discharge its attorney at will is justified by "the special relationship between attorney and client"). If anything, the case for allowing in-house counsel sometimes to recover post-termination damages on breach of contract claims is stronger than on claims of retaliatory discharge. *See Nordling*, 478 N.W.2d at 504 ("A retaliatory discharge claim is more likely [than a breach of contract claim] to implicate the attorney-client relationship, raising issues not only of divulging client confidences, but confidences that relate to client wrongdoing."). In short, the Illinois Supreme Court would not bar the recovery of post-termination breach of contract damages from a former client-employer by former in-house counsel where the claim does not arise from the legal advisor's activities as such or otherwise threaten the integrity of the attorney-client relationship.

The upshot is that Kiser states a viable claim for breach of contract. One can reasonably infer from the complaint that Kiser was more than just a general counsel. As noted above, the employment contract describes Kiser as "Executive Administrator," (Compl. Ex. C, at 1), a title allegedly created to encompass duties performed beyond those of general counsel. Kiser

contends that the contractual list of "Performance Goals" made him responsible for, in addition to providing legal services, assisting in the employment and retention of qualified employees and "[p]articipat[ing] as a member of the [District's] management team." (*Id.* at 11.) Although the District asserts that it had eliminated Kiser's non-attorney functions by the time he was terminated, Kiser does not concede this assertion of fact. (Resp. at 9 n.14 (distinguishing *Anastos* on the ground that plaintiff there "only had legal duties"; *id.* at 10 (Kiser "served as general counsel in conjunction with his other administrative duties").)

More significantly, the alleged basis for termination, "cost effectiveness," would appear to have little or nothing to do with the attorney-client relationship between Kiser and the District. This appears to be an ordinary compensation dispute. *See Nordling*, 478 N.W.2d at 502. The District does not argue that litigating Kiser's claim will force disclosure of confidential communications or that allowing such claims generally would affect client trust or attorney autonomy. All jobs, whether filled by attorneys or non-attorneys, are subject to diminished workloads and tightening budgets. Employers accept these risks in every fixed-duration employment contract. When an employer hires an attorney-employee to serve as in-house counsel for a fixed duration, then terminates the employee early for a reason unrelated to his legal duties, it is perfectly appropriate for the employer to pay post-termination breach of contract damages.

In any event, *Anastos* is distinguishable. Because the appellate court was reviewing a lower court's order granting a section 2-615 (735 ILCS 5/2-615) motion to dismiss, it viewed the complaint in the light most favorable to the plaintiff, Anastos, and accepted all well-pleaded facts as true. *Anastos*, 618 N.E.2d at 1050. Anastos admitted that the defendant discharged him "as general counsel," and alleged that his dismissal was "without cause." *Id.* That the dismissal was "without cause" says little about whether the reason for the dismissal related to the attorney-client relationship. A client may lose trust in and terminate his attorney for reasons that are wholly unrelated to the attorney's performance and therefore insufficient to constitute "cause"

13

under the contract. Post-termination breach of contract damages are generally unavailable to the terminated attorney in such a case, because a client must be free to fire an attorney he does not trust. Although a federal court might have hypothesized reasonable facts consistent with Anastos's complaint to take his case outside the general rule, Illinois is a fact-pleading jurisdiction. But even in federal court, Anastos may have been doomed. That he was discharged "as general counsel" creates a reasonable inference that the reason for the dismissal related to his responsibilities as general counsel. Unlike Kiser, Anastos apparently failed to provide even minimal notice of an alternative theory that would not have implicated the attorney-client relationship. The court denies the District's motion to dismiss Count 2.

E. Count 3: Constitutional Violations

Count 3 encompasses five separate constitutional claims: (1) substantive due process, (2) procedural due process, (3) freedom of speech, (4) freedom of association, and (5) equal protection. The District concedes that it acted under color of state law, but nonetheless moves to dismiss each claim.

1. *Substantive Due Process*

Kiser alleges that the District violated his substantive due process rights by taking his property interest in continued employment. A substantive due process claim requires: (1) that the property interest allegedly violated be "fundamental" and "deeply rooted in this Nation's history," and (2) that the asserted fundamental liberty interest be carefully described. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citation omitted).

This court finds that Kiser's property interest in his employment contract is not "deeply rooted in this Nation's history." As the Sixth Circuit aptly explained:

> Most, if not all, state-created contract rights . . . are not protected by substantive due process. The substantive Due Process Clause is not concerned with the garden variety issues of common law contract. . . . Routine state-created contractual rights are not "deeply rooted in this Nation's history and tradition" and, although important, are not so vital that "neither liberty nor justice would

14

> exist if [they] were sacrificed." In the present case, we do not
> believe liberty and justice are threatened, in the constitutional
> sense, by the failure of the government and its officials to abide by
> their contract with [the plaintiff]. Governments breach contracts
> virtually every day without dire consequences ensuing to the
> human dignity or basic autonomy of the promisees.

*Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990) (citations omitted). Seventh Circuit case

law is in accord. *See Kauth v. Hartford Ins. Co.*, 852 F.2d 951, 958 (7th Cir. 1988) ("[I]n cases

where the plaintiff complains that he has been unreasonably deprived of a state-created property

interest . . . the plaintiff has not stated a substantive due process claim."); *Brown v. Brienen*, 722

F.2d 360, 367 (7th Cir. 1977) (observing that there is "nothing in the Bill of Rights about

protecting contractual rights"); *see also Nicholas v. Penn. State Univ.*, 227 F.3d 133, 142 (3d Cir.

2000); *Singleton v. Cecil*, 176 F.3d 419, 425-28 (8th Cir. 1999) (en banc); *McKinney v. Pate*, 20

F.3d 1550, 1560 (11th Cir. 1994) (en banc); *Huang v. Bd. of Governors of Univ. of N.C.*, 902

F.2d 1134, 1142 n.10 (4th Cir. 1990). The cases cited by Kiser address procedural, not

substantive, due process. Because Kiser's alleged property interest is not protected by principles

of substantive due process, the court grants the District's motion to dismiss this claim.

2. *Procedural Due Process*

     Kiser next asserts that the District violated his procedural due process rights by not

affording him either a pre-termination or post-termination hearing preceded by notice of, and the

reasons for, his termination. To state a procedural due process claim, a plaintiff must allege that

a state actor deprived him of a protected property interest without due process of law. *See*

*Doherty v. City of Chi.*, 75 F.3d 318, 322 (7th Cir. 1996). The District argues that (1) Kiser did

not have a property interest in his continued employment and, (2) even if he had such an interest,

his own allegations establish that his due process rights were not violated.

     As to the first argument, the critical question is whether Kiser had a "legitimate claim of

entitlement" to continued employment. *Thorton v. Barnes*, 890 F.2d 1380, 1386 (7th Cir. 1989)

(quoting *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972)). Every contract that

limits the reasons an employee may be terminated creates such an entitlement. *See Roth*, 408

U.S. at 578 (holding that a plaintiff had an employment interest until the date his appointment terminated). Kiser's contract was to last through June 30, 2003, but outlined five reasons for which it could be terminated earlier.

The District argues that this list was not exhaustive, but that is both implausible and beside the point. There would be little point in agreeing to a list of reasons if the District retained unconstrained residual discretion to terminate Kiser for an unlisted reason. *See Head v. Chi. Sch. Reform Bd. of Trustees*, 225 F.3d 794, 798 & n.2 (7th Cir. 2000) ("By its own terms, the contract, [which provided that the agreement 'may be terminated for any one of the following reasons'], could be terminated *only* on certain limited grounds.") (emphasis added). Even without the list, by entering into a fixed-term employment contract without reserving an unqualified right to terminate Kiser before the end of the term, the District disavowed its right to discharge Kiser at any time. *Foiles v. N. Greene Unit Dist. No. 3*, 633 N.E.2d 24, 26 (Ill. App. Ct. 1994) ("Where a contract of employment is for a definite term, it may not be terminated at an earlier period, except for cause by mutual agreement, . . . unless the right to do so is reserved in the contract . . . .") (quoting 30 C.J.S. Employer-Employee Relationship § 38, at 69 (1992)). The District also repeats its contention that clients have an absolute right to terminate their attorneys for any reason at any time. Having already rejected that argument, *see supra*, this court need not revisit it in detail. Suffice it to say that certain kinds of attorney terminations, perhaps including Kiser's, may give rise to post-termination breach of contract damages. It follows that Kiser had a legitimate claim of entitlement to continued employment.

To determine what procedural protections an employee is entitled to under the due process clause, courts balance three factors: (1) the private interest affected by the official action, (2) the risk that this interest was erroneously deprived under the existing state procedural scheme and the probable value, if any, of additional or substitute procedural safeguards, and (3) the state's interest, taking into account the function involved and the fiscal and administrative burdens that the substitute or additional safeguards would entail. *Mathews v. Eldridge*, 424 U.S.

319, 335 (1976). The Supreme Court has applied this framework to conclude that "a public employee dismissible only for cause [is] entitled to a very limited hearing prior to his termination followed by a more comprehensive post-termination hearing." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)). The pre-termination hearing "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545-46. A public entity prior to the termination must provide "oral or written notice of the charges against [the employee], an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546.

The District argues first that Kiser was not entitled to a due process hearing at all because there were no charges against him to confront. The District cites case law holding that no pre-termination hearing is required for workforce reductions, *Brooks v. Bd. of Comm'rs of the Chi. Hous. Auth.*, No. 97 C 5166, 1998 U.S. Dist. LEXIS 6221, at *7-12 (N.D. Ill. Apr. 20, 1998), and *Mayfield v. Kelly*, 801 F. Supp. 795, 798-99 (D.D.C. 1992). These cases are distinguishable with respect to each of the three *Mathews* factors. Both relied heavily on the impracticality of individualized hearings when large numbers of employees are being simultaneously laid off. In contrast, Kiser was apparently alone in being terminated. *Brooks* and *Mayfield* also emphasized that the loss of a job pursuant to a workforce reduction does not carry the same stigma as a for-cause termination. To be sure, having one's position eliminated for fiscal reasons is less stigmatizing than a for-cause termination, but Kiser nonetheless had substantial personal interests at stake in losing his job and benefits so close to his planned retirement. Finally, the court in *Brooks* reasoned that a hearing would have had little value because the plaintiff there conceded that the workforce reduction was bona fide. Kiser's allegations do indicate that the District would incur high costs in retaining him, but he does not concede that these costs were not justified, that "cost effectiveness" was the District's actual motivation, or that terminating him on

this ground would not amount to a breach of contract. What was the probable value, if any, of the District providing Kiser with an opportunity to confront it on these disputed issues? The District expressly invited input from Kiser before terminating him (Compl. Ex. E.), so there must have been some value in doing so. Balancing the *Mathews* factors in light of the facts pleaded, this court finds that due process may have required the District to provide some pre-termination opportunity to be heard. Kiser's case appears to be closer to a lone for-cause termination on disputed facts than it is to an undisputedly bona fide workforce reduction.

The District argues in the alternative that it afforded Kiser adequate procedural protections. Kiser himself alleges that the District at an April 25, 2001 meeting told him that it planned to terminate him to save costs. A follow-up letter dated April 27 is attached to the complaint, in which the District invited Kiser to advise the Board, through its outside counsel, "of any facts or law which you believe the Board should consider." (*Id.*) The Board did not formally decide to terminate Kiser until a public meeting on June 25, a decision which took effect on June 30. Plainly, Kiser had advance notice of his possible termination and an opportunity to provide input to the District. The only remaining question is whether the content of the notice was sufficient. Kiser argues that the District provided no supporting data or explanation for its cost-ineffective determination. *See Loudermill*, 470 U.S. at 546 (requiring employer to provide pre-termination explanation of its evidence). With two months notice, Kiser had ample opportunity to request clarification. But perhaps he did so and was rebuffed. And perhaps the District actually relied on false information. Kiser could not reasonably be expected to have found and rebutted such mistakes in the dark. His pre-termination due process claim cannot be dismissed on the pleadings.

Curiously, the parties' briefs skip over what would appear to be a more basic point. Kiser alleges that he was also denied a *post*-termination hearing. Nothing in the record demonstrates the falsity of this claim. That allegation, when combined with allegations concerning Kiser's employment status and early termination, suffices to state a procedural due process claim.

18

### 3. *Freedom of Speech*

Kiser claims that the District violated his free speech rights because it fired him in retaliation for his refusal to speak in opposition to several former School Board members' efforts to terminate Weber during a public School Board meeting held in 1998. "It is well established that the government may not discharge an employee for reasons that infringe upon that employee's constitutionally protected interest in freedom of speech." *Vukadinovich v. Bd. of Sch. Trustees*, 978 F.2d 403, 408 (7th Cir. 1992). To recover for such a retaliatory discharge, an employee must show: (1) that the speech he engaged in was constitutionally protected and (2) that the defendants retaliated against him because of that speech. *Id.* The District argues that Kiser's silence was not constitutionally protected.

A public employee's speech is constitutionally protected only if the employee's interest in expressing himself as a citizen on a matter of public concern outweighs any injury the speech could cause to the employer's interest in promoting effective and efficient public service. *Connick v. Myers*, 461 U.S. 138, 142 (1983). Kiser's claim fails because he specifically alleges that he was expressing himself as a public employee, not as a citizen: "Defendants retaliated against and harmed [him] because he exercised his constitutional speech rights when he *fulfilled his duties as Executive Administrator* by not speaking publicly." (Compl. ¶ 70(c) (emphasis added).) By alleging that he was expressing himself in his official capacity as Executive Administrator, Kiser has pleaded himself out of court. *See Youker v. Schoenenberger*, 22 F.3d 163, 166-67 (7th Cir. 1994) (holding that the plaintiff's speech was not constitutionally protected because it was made in his official capacity and "there was simply no evidence that [he] was speaking 'as a citizen' on a matter of public concern") (quoting *Connick*, 461 U.S. at 143). This claim is therefore dismissed.

### 4. *Freedom of Association*

The Supreme Court has recognized that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the

19

role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). In certain circumstances, adverse employment actions motivated by spousal identity or conduct may violate this right of intimate association. *See, e.g., Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999); *Newborn v. Morrison*, 440 F. Supp. 623, 626-27 (N.D. Ill. 1977).

Kiser alleges that the District unduly intruded into his marriage relationship by retaliating against him for associating with McCammon, who, as explained above, attempted to have Weber replaced. In support of this theory, Kiser alleges: (1) that a Board Member told him that his career would be "ruined" if he did not tell his wife to stop her attempt to remove Weber (Compl. ¶ 66), and (2) that Weber removed him from the Administrative Cabinet because he could not "control" his wife (*id.* ¶ 69). The District raises several arguments directed at this claim, most of which assume that the claim is grounded exclusively on these two events. Kiser makes clear in his response, however, that he believes he was *discharged* because of his association with his McCammon. The question is whether the District reasonably should have foreseen this theory of recovery based on the allegations in the complaint. *See Rogers v. Wexler*, No. 01 C 1943, 2002 U.S. Dist. LEXIS 5457, at *4-6 (N.D. Ill. Mar. 28, 2002).

Several factors convince this court that the answer is yes. The penultimate paragraph in Count 3 specifically states that Kiser's constitutional claims are based on "acts including, *but not limited to*, the following: . . . the District retaliated against and harmed Kiser because he exercised his constitutional right of freedom of association . . . ." (*Id.* ¶ 70(d) (emphasis added).) The District apparently understood the import of the emphasized phrase when it connected the association claim to paragraphs 63-69. (Mem. at 9.) But Count 3 also includes paragraph 60, which incorporates the unlawful termination allegations of paragraphs 1-42. From these paragraphs and the single prayer for relief—in which Kiser requests, among other things, reinstatement and damages for lost income and benefits—it is obvious that all of Kiser's claims derive from his allegedly unlawful termination.

This leaves the District with only two arguments. First, the District describes as "incredible" Kiser's theory that his discharge was motivated by his wife's conduct three years earlier. (Reply at 13.) The only case cited by the District in support of this argument is a summary judgment decision, *Vukadinovich v. Board of School Trustees*, 978 F.2d 403, 408 (7th Cir. 1992). Whether a reasonable jury could believe Kiser is simply not the issue on a motion to dismiss. Human beings can remember events for longer than three years. It is therefore impossible to say with certainty that none of the relevant decisionmakers carried a grudge for this period of time.

Second, the District argues that a client may not be forced to "remain with its attorney . . . while the attorney's spouse is against the client." (Reply at 13.) There may be something to this argument, but the District has failed to develop it adequately. The argument appears for the first time in the District's reply brief and consists of two sentences and one case citation, *Collins v. Voinovich*, 150 F.3d 575 (6th Cir. 1998). *Collins* dealt with a political-firing claim and was decided on summary judgment. It provides no support for the proposition that a state employer has an absolute right to fire an attorney whenever the state's interests and the interests of the attorney's spouse diverge. Indeed, the Second Circuit, in upholding a former state lawyer's intimate association claim, suggested that the relevant inquiry is whether the spouse's activity could "reasonably be found to justify" the lawyer's termination. *Adler*, 185 F.3d at 44. This is a fact-bound question, inappropriate for determination on the current record.

Accordingly, the District's motion to dismiss Kiser's intimate association claim is denied.

5. *Equal Protection*

Finally, Kiser alleges that the District violated his right to equal protection by treating him differently than it treated similarly situated employees. The District raises two objections to this claim, neither of which is convincing. The District's first objection derives from the patently false premise that the "entire basis for Kiser's Equal Protection claim" consists of a bare legal

conclusion. (Mem. at 12.) The conclusory phrase quoted by the District is preceded by language that puts the claim into context:

> Defendants . . . for reasons wholly unrelated to any legitimate governmental interest, willfully or recklessly, knowingly, with malice and spite, in bad faith, and for purposes of retaliation violated Kiser's constitutional and statutory rights, . . . through egregious acts including, but limited to the following: . . . (e) Defendants violated Kiser's right to equal protection under the law by treating Kiser differently from other similarly situated employees.

(Compl. ¶ 70.) Count 3 outlines several potential sources of hostility toward Kiser and incorporates the facts concerning his allegedly unlawful termination. The complaint provides reasonable notice of the gravamen of Kiser's equal protection theory.

Second, the District argues that Kiser cannot state an equal protection claim because he did not allege that other lawyers were employed by the District. The potential relevance of other lawyers is obvious from the complaint, so the District can reasonably foresee a subsequent allegation that such lawyers existed. For this reason, the omission of a specific allegation of fact concerning other lawyers in the complaint does not mandate dismissal. *See Rogers*, 2002 U.S. Dist. LEXIS 5457, at *4-6. Nor is it clear on the face of the pleadings that only a lawyer could be "similarly situated" with Kiser for equal protection purposes. In any event, the Supreme Court has recognized that a "class of one" can bring an equal protection claim. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To state such a claim, a plaintiff must allege that he "has been intentionally treated differently from other similarly situated employees and that there is no rational basis for the difference in treatment." *Id.* at 564. The language quoted above demonstrates that Kiser has met this burden. The District's motion to dismiss this claim is therefore denied.

## III. Conclusion

For the foregoing reasons, the court dismisses Kiser's claims against the individual defendants in their official capacities and dismisses his substantive due process and free speech

claims against all defendants. The District's motion to dismiss the remainder of Kiser's claims and to strike the demand for punitive damages is denied.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: August 29, 2002